IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SCOTT T.<br><br>Plaintiff,<br><br>vs.<br><br>FRANK BISIGNANO,<br>Commissioner of Social Security,<br><br>Defendant. | **8:25-cv-00365-BCB**<br><br>**MEMORANDUM AND ORDER ON JUDICIAL REVIEW OF COMMISSIONER'S DENIAL OF BENEFITS** |

Plaintiff Scott T.[1] seeks judicial review of the denial of his application for disability insurance benefits by the defendant Commissioner of the Social Security Administration. Filing 1 at 3. Scott T. has moved for an order reversing the Commissioner's decision. Filing 1 at 3. The Commissioner did not file a motion for an order affirming the Commissioner's decision, which fails to comply with the Court's general order. *See* General Order No. 2015-05. Nevertheless, the Court will consider the Commissioner's opposition.[2] For the following reasons, the Court denies Scott T's motion to reverse. Consequently, the Commissioner's decision is affirmed.

## I. INTRODUCTION

### A. Procedural Background

Scott T. applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, on April 13, 2021. Filing 5-5 at 2–3 (Administrative Record (AR) 189–

---

[1] The Court will refer to Plaintiff by first name and last initial to protect his privacy.

[2] A district court has discretion to decide whether a failure to follow an order is substantially justified or harmless. *See, e.g., Lloyd v. FedLoan Servicing*, 105 F.4th 1020, 1030 (8th Cir. 2024) (holding that because the failure to comply with a district court's order concerning an expert's rebuttal report was not harmless or substantially justified, the district court did not abuse its discretion in excluding the report). Although the Commissioner has offered no justification for the failure to follow the General Order, the Court concludes that the failure is harmless because the Commissioner presented his arguments to affirm, Filing 14, and Plaintiff had the opportunity to reply, Filing 15. The Commissioner is reminded that in the future full compliance with the Court's general orders and local rules is expected.

90). Scott T. alleged an onset disability date of May 14, 2018. Filing 5-5 at 2–3 (AR 189–90). Scott T.'s claims were initially denied by the Social Security Administration (SSA) on January 26, 2023. Filing 5-3 at 2 (AR 74). The claims were again denied on July 14, 2023, upon reconsideration by the SSA. Filing 5-3 at 10 (AR 82).

On July 28, 2023, Scott T. requested a hearing by an administrative law judge (ALJ) pursuant to 20 C.F.R. §§ 404.929 et seq., and 416.1429 et seq., following the two denials. Filing 5-4 at 30–31 (AR 118–19). The ALJ held a telephonic hearing to review the denial of Scott T.'s applications on April 16, 2024. Filing 5-2 at 36 (AR 35); Filing 5-4 at 72 (AR 160). On May 1, 2024, the ALJ issued a ruling in favor of the Commissioner, denying Scott T.'s claims for disability insurance benefits. Filing 5-2 at 18–29 (AR 17–28). Scott T. submitted a request for review of the ALJ's decision to the SSA Appeals Council on June 12, 2024. Filing 5-4 at 99–100 (AR 187–88). The Appeals Council issued an order denying Scott T.'s request for review on March 28, 2025. Filing 5-2 at 2 (AR 1). On May 23, 2025, Scott T. filed this action seeking judicial review. Filing 1. Scott T. states in his brief in support of his Motion for Order Reversing the Commissioner's Decision that "the decision of the Commissioner should be reversed and remanded solely for calculation and awarding of benefits," but in the alternative, he states that "the decision should be reversed and the matter remanded for a new hearing and a decision in accordance with [his arguments]." Filing 13 at 20.

### B. Factual Background

*1. The Claimant and the Alleged Disabilities*

Scott T. was forty-one years old at the time of the alleged disability onset date of May 14, 2018, classifying him as a "younger person" under 20 C.F.R. §§ 404.1563(c) and 416.963(c) (defining a younger person as one who is "under age fifty"). Filing 5-3 at 3 (AR 75); Filing 5-5 at 2–3 (AR 189–90). Scott T. "subsequently changed age category to a younger individual age 45-

49." Filing 5-2 at 27 (AR 26). Scott T. is classified as having at least a high school education, which places him in the fourth—and highest—educational ability as listed under 20 C.F.R. §§ 404.1564 and 416.964. Filing 5-2 at 27 (AR 26). Scott T. lives in a house with his wife and family. Filing 5-6 at 33 (AR 245). Scott T. has one child who no longer resides in the household and a stepdaughter, the child of his spouse, who continues to reside in the household. Filing 5-2 at 49 (AR 48); Filing 5-5 at 3 (AR 190). "[Scott T.] did not engage in substantial gainful activity during the period from his alleged onset date of May 14, 2018, through his date last insured of December 31, 2023." Filing 5-2 at 20 (AR 19). Scott T. has not performed work after the alleged disability onset date. Filing 5-3 at 2, 11 (AR 75, 83). However, Scott T. reported an income of $26,008.45 in 2018 and has received long-term disability payments since the end of that year. Filing 5-2 at 20 (AR 19); Filing 5-5 at 4–6 (AR 191–93); Filing 5-6 at 26 (AR 238). Scott T. alleged in his September 15, 2021, disability report that he has a closed lumbar vertebra fracture, bulging disks in his neck with bone spurs, and bulging disks in his back. Filing 5-6 at 2 (AR 225).

Scott T. avers two general grounds for an order to reverse the Commissioner's decision. First, Scott T. argues that the ALJ failed to explain properly the persuasive value he assigned to the opinions authored by Dr. John McClellan, Kristianna Redman, NP, and Sarah Stamm, PA, using the "supportability" and "consistency" factors. Filing 13 at 12. Second, Scott T. contends the ALJ improperly evaluated Scott T.'s subjective complaints in finding that his testimony was not credible. Filing 13 at 17–18. The Court will provide a statement of facts focused on the medical records and other evidence that are relevant to Scott T.'s challenges to the ALJ's decision with to provide a more succinct discussion.

    2. *Medical Records and Evidence*

        a. Treating Physicians' Opinions of Scott T.'s Physical Symptoms

The Administrative Record shows Scott T. presented before various physicians and other medical professionals between May 14, 2018, and December 31, 2023. *See generally* Filing 5-3; Filing 5-6; Filing 6-1; Filing 6-2.

Scott T. was first seen by Sarah Stamm, PA-C on May 14, 2018, for back pain and right shoulder pain resulting from a May 6, 2018, fall down the stairs. Filing 6-1 at 34 (AR 355). PA Stamm diagnosed Scott T. with Scheuermann's Kyphosis and a protrusion of the T8–T9 vertebrae. Filing 6-1 at 37 (AR 358). Scott T. was then referred to Dr. John W. McClellan of Nebraska Spine + Pain Center and presented before Dr. McClellan on June 6, 2018. Filing 6-1 at 40 (AR 361). Dr. McClellan assessed Scott T. and observed thoracic pain with radiation around the right side. Filing 6-1 at 42 (AR 363). Dr McClellan recommended a plan that consisted of physical therapy "for thoracic herniation with underlying Scheuermann's Kyphosis," herniation on the right, and to follow up in six weeks. Filing 6-1 at 43 (AR 364). Dr. McClellan also referred Scott T. to Dr. Phillip E. Essay for a thoracic epidural. Filing 6-1 at 43 (AR 364).

On June 8, 2018, Scott T. attended an initial evaluation with Dr. Essay. Filing 6-1 at 44 (AR 365). After the initial evaluation, Dr. Essay reported that Scott T. described "pain to be at the central mid back, T9–T12 region, with some radiation to the right." Filing 6-1 at 44 (AR 365). Dr. Essay's initial evaluation notes further stated that Scott T. had "constant, burning, shooting and numb," and that the "pain worsens with standing, sitting, prolonged positions, and driving." Filing 6-1 at 44 (AR 365). Dr Essay confirmed Dr. McClellan's recommendation for a thoracic epidural steroid injection, but he was unable to carry out the injection during the initial visit due to a lack of insurance authorization. Filing 6-1 at 48 (AR 369). Dr. Essay finally stated that "[o]nce [insurance] has been authorized, we will call him to schedule [the thoracic epidural steroid

injection] accordingly." Filing 6-1 at 48 (AR 369). Scott T. returned to Nebraska Spine + Pain Center on June 28, 2018, to receive a thoracic spine epidural injection from Dr. Essay. Filing 6-1 at 49 (AR 370).

Scott T. followed up with Nebraska Spine + Pain Center, presenting before Dr. McClellan on July 23, 2018. Filing 6-1 at 52 (AR 373). Dr. McClellan's notes record that Scott T. had experienced "mild improvement from the epidural injection but has returned to preinjection status." Filing 6-1 at 52 (AR 373). Dr. McClellan ordered an MRI during the visit that demonstrated the "cord is 50% compressed on the right due to the severe kyphosis and disc herniation at the apex." Filing 6-1 at 56 (AR 377). Dr. McClellan recommended that Scott T. seek a thoracic myelopathy exam at IMC Rehabilitation under Dr. Aish Patil. Filing 6-1 at 56 (AR 377).

On September 5, 2018, Scott T. returned to Nebraska Spine + Pain Center, presenting before Dr. McClellan and expressing "[n]o relief from the thoracic epidural with Dr. Essay." Filing 6-1 at 58 (AR 379). Dr. McClellan opined that "[s]ince the thoracic epidural gave no relief we have started to focus on the two stress fractures and moderate to severe foraminal stenosis at L5/S1." Filing 6-1 at 58 (AR 379). Dr. McClellan recommended Scott T. return to Dr. Essay for diagnostic injections around the fractures and moderate foraminal stenosis locations with the goal of identifying whether the L5 chronic stress fractures and stenosis were the source of pain since the "thoracic epidural did not help." Filing 6-1 at 60 (AR 381). Dr. McClellan requested that Dr. Essay explore pain management options after identifying the response to the injection. Filing 6-1 at 60 (AR 381).

Scott T. underwent another round of diagnostic steroid injections at Nebraska Spine + Pain Center with Dr. Essay on October 5, 2018. Filing 6-1 at 61–63 (AR 382–84). Dr. Essay noted that Scott T. tolerated the procedure without complication and that the post procedure response yielded

a "10% relief of discomfort." Filing 6-1 at 63 (AR 384). During a follow up appointment on October 29, 2018, Dr. McClellan reported that Scott T.'s most recent injection "gave good relief of the chronic right leg pain. [Scott T.] reports approximately 40% to 50% fairly immediate response. He continues to feel better in the right leg from the injection." Filing 6-1 at 65 (AR 386). During the appointment, Scott T. continued to describe lumbar pain, and Dr. McClellan reported a "long discussion" about the considerations of a lumbar fusion surgery. Filing 6-1 at 67, 71 (AR 388, 392).

On January 16, 2019, Scott T. returned to Nebraska Spine + Pain Center to complete pre-surgical conferences with Dr. McClellan, where they discussed the risks and benefits of the planned L4 through S1 transforaminal lumbar interbody fusion with decompression procedure. Filing 6-1 at 69, 71 (AR 390, 392). On January 17, 2019, Scott T. underwent a posterior spinal fusion of the L4-L5 and L5-S1 vertebrae performed by Dr. McClellan. Filing 6-1 at 134–36 (AR 455–57).

Dr. McClellan referred Scott T. to Megan R. Freeman, PT, for a physical therapy evaluation following the operation. Filing 6-1 at 80 (AR 401). PT Freeman reported that Scott T. experienced "significant improvement in low back pain" and reported "decreased 'problems with the legs', with improved tolerance in standing and walking." Filing 6-1 at 80 (AR 401). On April 17, 2019, Scott T. returned to PT Freeman, who noted in the subjective evaluation that he was able to tolerate sitting and standing for 2–3 hours, trying to get up and move every 45 minutes. Filing 6-1 at 87 (AR 408). Additionally, Scott T. was restricted to lifting 15–20 pounds and to avoid repetitive bending or twisting. Filing 6-1 at 87 (AR 408).

Following the operation, Scott T. attended several follow up visits with PA Stamm and Dr. McClellan between February 25, 2019 and October 14, 2019. Filing 6-1 at 73–76, 83–86, 93–97,

6

99–102, 104–07, 109–12, 114–17, 119–22 (AR 394–97, 404–07, 414–18, 420–23, 425–28, 430–33, 435–38, 440–43). Over the course of these several visits, Scott T. noted "continued improvement from a lumbar standpoint," but was still experiencing mid-back pain. Filing 6-1 at 83 (AR 404). Scott T. also noted significant improvement and relieved back and leg pain compared to pre-surgery levels, even "pull[ing] weeds for about 20 or 30 minutes." Filing 6-1 at 93 (AR 414). During multiple work status updates between January 15, 2020 and March 6, 2020, Dr. McClellan opined that Scott T. was unable to return to his former occupation, but that he could work with restrictions. Filing 6-1 at 98, 103 (AR 419, 424). Dr. McClellan's suggested restrictions included avoiding lifting over 40 pounds, as well as a restriction on repetitive bending, twisting, or stooping, and the ability to change positions as needed for comfort. Filing 6-1 at 98, 103 (AR 419, 424). On March 20, 2020, Scott T. returned to Nebraska Spine + Pain Center complaining of pain between the shoulder blades with bilateral arm numbness, despite Dr. McClellan's observations that "he [was] doing very well from the lumbar fusion." Filing 6-1 at 104 (AR 425). During this visit, Dr. McClellan recommended that Scott T. partake in physical therapy to conservatively manage his symptoms. Filing 6-1 at 106 (AR 427).

On May 20, 2020, Scott T. followed up with Dr. McClellan and noted that "[a]t this point, [Scott T.] really is not employable recovering from the lumbar fusion and at this point, it looks as if the cervical surgery will be completed in the next 3 to 6 months." Filing 6-1 at 111 (AR 432). In the same visit, Dr. McClellan recommended Scott T. complete physical therapy, but if pain persists, "then surgery would include a single-level [anterior cervical discectomy and fusion (ACDF)] . . . Once he is fully recovered from ACDF, he should be employable . . . in a light medium to medium demand category." Filing 6-1 at 111 (AR 432). On July 20, 2020, Dr. McClellan opined that he was unsure that Scott T. was employable at that point due to his severe

thoracic hyperkyphosis and could only stand or sit for two hours before needing to lie down. Filing 6-1 at 116 (AR 437).

On December 3, 2020, Scott T. attended an initial physical evaluation at Live Well Physical Therapy. Filing 6-1 at 153 (AR 474). Physical Therapist Susan Hageman noted that Scott T. had "pain, muscle weakness, deficits in [range of motion], abnormal posture, decreased activity tolerance, and difficulty completing [activities of daily living]." Filing 6-1 at 154 (AR 475). However, after attending two sessions of physical therapy in December 2020, Scott T. was discharged from the care of Live Well Physical Therapy due to his family members contracting Covid-19. Filing 6-1 at 168 (AR 489).

On November 3, 2021, Scott T. returned to Nebraska Spine + pain center and presented before PA Stamm for a "[l]ong time follow up" of his 2019 spine surgery. Filing 6-1 at 222 (AR 543). While the appointment was tabbed as a follow up, Scott T.'s primary complaint was bilateral hand and arm numbness. Filing 6-1 at 222 (AR 543). The notes relating to the November 3, 2021, appointment state that Scott T. "report[ed] that he is doing fair. He does have chronic thoracic and low back pain" and "known thoracic kyphosis." Filing 6-1 at 222 (AR 543). Scott T. was seen again by PA Stamm on November 29, 2021, after she procured results of an electromyography (EMG) test of his upper extremities. Filing 6-1 at 292 (AR 613). The result of Scott T.'s EMG testing indicated "moderate right sensorimotor median neuropathy consistent with moderate carpal tunnel syndrome." Filing 6-1 at 304 (AR 625). PA Stamm recommended that Scott T. "be evaluated and undergo a consultation with Dr. Jason Mickels for evaluation and potential carpal tunnel release on the right. [Scott T.] did show a positive carpal compression test on the left as well but no EMG evidence." Filing 6-1 at 236, 295 (AR 557, 616). Following a consultation, Jason

J. Mickels, MD recommended treatment of the right-hand carpal tunnel syndrome first, given the EMG studies. Filing 6-1 at 302 (AR 623).

On March 14, 2022, Dr. Mickels treated Scott T., for a right carpal tunnel syndrome release. Filing 6-1 at 299–300 (AR 620–21). Dr. Mickels noted on a March 22, 2022, follow up appointment that Scott T. was "doing very well" and "demonstrate[d] good mobility of the fingers and thumb of that right hand." Filing 6-1 at 298 (AR 619).

On October 4, 2023, Scott T. returned to Nebraska Spine + Pain Center to be seen by PA Stamm. Filing 6-2 at 4 (AR 815). Scott T. was seen for a long-term follow-up of his prior lumbar surgery, along with "[b]ilateral arm pain/numbness/weakness." Filing 6-2 at 4 (AR 815). Scott T. reported difficulty "squeez[ing] a pair of pliers" but reported that "the numbness in his right hand is better with sleeping at night." Filing 6-2 at 4 (AR 815). PA Stamm observed a 5 out of 5 score on strength testing for all eight tests and further recommended Scott T. get regular exercise. Filing 6-2 at 6 (AR 817). PA Stamm's only noted function restriction at this point was limitation on standing for more than thirty minutes. Filing 6-2 at 7 (AR 818).

b.   Self and Lay Assessments of Scott T.'s Functionality

On October 30, 2021, Scott T. completed a functional report for use by the Social Security Administration in considering his application for disability benefits and supplemental security income. Filing 5-6 at 41–48 (AR 253–60). In his report, Scott T. claimed he was unable to work due to numbness in his hands and arms after being on his feet for an extended time of two hours, along with back pain. Filing 5-6 at 41 (AR 253). Scott T. further stated that he spent much of his time completing household chores with rest in between depending on his level of pain. Filing 5-6 at 42 (AR 254). Scott T. indicated that his household chores consisted of cooking, cleaning, and caring for household pets. Filing 5-6 at 42 (AR 254). Further household responsibilities included "mowing, laundry, cleaning, [and] household repairs." Filing 5-6 at 43 (AR 255). However, Scott

9

T. stated that help is required when "moving/lifting heavy items." Filing 5-6 at 43 (AR 255). Scott

T. indicated no change in his cooking habits since his conditions began, and prepared daily single-

course meals. Filing 5-6 at 43 (AR 255). Scott T. further stated that he was able to go outside daily,

and was able to travel by walking and by car. Filing 5-6 at 44 (AR 256). Scott T. indicated that he

was able to shop in store for food twice a week and further stated that he was able to walk for one

mile before needing to stop and rest. Filing 5-6 at 44–46 (AR 256–58).

On October 20, 2021, Scott T.'s wife, Johnel R., completed a third-party function report

on behalf of Scott T. regarding Scott T.'s limitations. Filing 5-6 at 33–40 (AR 245–52). Johnel R.

reported that "repetitive movement causes pain, [Scott T.] can do any activity for 30 min.–1 hr.,

based on intensity and is then in pain, when he overdoes it, he is in complete rest mode for 1–2

days." Filing 5-6 at 33 (AR 245). Johnel R. also reported that Scott T. is unable to "spend an entire

day do[ing] any of [his hobbies and interests]. Last time he tried he ended up in the ER with

extreme pain." Filing 5-6 at 37 (AR 249). Johnel R. further indicated that Scott T. could walk for

one mile and "may lift something 50+ pounds, but then needs to sit down for 1–2 hours to recover."

Filing 5-6 at 38 (AR 250). As for Scott T.'s social activities, Johnel R. stated that Scott T. helps

his children with car maintenance, dinner with family, attends his son's football games, and talks

to his family on the phone. Filing 5-6 at 37–38 (AR 249–50). When asked about any unusual

behaviors or fears by Scott T., Johnel R. "consider[ed] his behavior as normal (usual)." Filing 5-6

at 39 (AR 251).

      c.   Evaluations of Medical Consultants Daniel R. Cronk, MD, and Jerry
          W. Tanner, MD

On January 16, 2023, Medical Consultant Dr. Daniel R. Cronk found Scott. T.'s medically

determinable impairments to be lumbar radiculopathy, degenerative disk and joint disease, and

lumbar spondylothesis. Filing 5-3 at 4 (AR 76). Dr. Cronk determined that Scott T.'s medically

determinable impairments could reasonably be expected to produce his alleged symptoms. Filing 5-3 at 5 (AR 77). Dr. Cronk also concluded that Scott T.'s statements about the intensity, persistence, and functionally limiting effect of the symptoms was consistent with the objective medical evidence. Filing 5-3 at 5 (AR 77).

Dr. Cronk concluded that Scott T. had a residual functional capacity (RFC) consistent with sedentary work. Filing 5-3 at 8 (AR 80). Dr. Cronk's report stated that Scott T. could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. Filing 5-3 at 6 (AR 78). Scott T. can stand and/or walk (with normal breaks) for a total of 2 hours and sit (with normal breaks) for a total of 6 hours in an 8-hour workday. Filing 5-3 at 6 (AR 78). According to Dr. Cronk, Scott T. can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but should never climb ladders/ropes/scaffolds. Filing 5-3 at 6 (AR 78). Dr. Cronk also stated that Scott T. is limited in reaching in front and/or laterally and overhead. Filing 5-3 at 6–7 (AR 78–79). Finally, Dr. Cronk concluded that Scott T. must avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, and hazards (machinery, heights, etc.). However, Dr. Cronk opined that Scott T. is permitted unlimited exposure to noise, fumes, odors, dusts, gases, and poor ventilation. Filing 5-3 at 7 (AR 79). Accordingly, Dr. Cronk determined Scott T. is not disabled for purposes of his Social Security and disability insurance benefits claims. Filing 5-3 at 8 (AR 80).

On reconsideration of Scott T.'s initial SSA determination, a second medical consultant, Dr. Jerry W. Tanner, found Scott T. not disabled with respect to his Social Security and disability insurance claims on July 14, 2023. Filing 5-3 at 10, 17 (AR 82, 89). In accord with Dr. Cronk's analysis, Dr. Tanner found that Scott T. had the following medically determinable impairments: lumbar radiculopathy, degenerative disk and joint disease, and lumbar spondylothesis. Filing 5-3

at 15 (AR 87). Dr. Tanner concluded that Scott T.'s medically determinable impairments could reasonably produce his symptoms. Filing 5-3 at 14 (AR 86). Dr. Tanner also concluded that Scott T.'s statements about the intensity, persistence, and functionally limited effects of the symptoms were substantiated by the objective medical evidence. Filing 5-3 at 14 (AR 86).

Dr. Tanner concluded that Scott T. had a residual functional capacity that remains consistent with sedentary work. Filing 5-3 at 13 (AR 85). Dr. Tanner's report stated that Scott T. could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. Filing 5-3 at 14 (AR 86). Scott T. can stand and/or walk (with normal breaks) for a total of 2 hours and sit (with normal breaks) for a total of 6 hours in an 8-hour workday. Filing 5-3 at 14 (AR 86). According to Dr. Tanner, Scott T. can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl, but should never climb ladders/ropes/scaffolds. Filing 5-3 at 15 (AR 87). Finally, Dr. Tanner concluded that Scott T. must avoid concentrated exposure to extreme cold and heat, wetness, humidity, vibration, and hazards (machinery, heights, etc.). However, Scott T. is permitted unlimited exposure to noise, fumes, odors, dusts, gases, and poor ventilation. Filing 5-3 at 15 (AR 87). Accordingly, Dr. Cronk determined Scott T. is not disabled for purposes of his Social Security and disability insurance benefits claims. Filing 5-3 at 17 (AR 89).

d.   Evaluation by Consultive Examiner Kristianna Redman, NP

Consultive Examiner Kristianna Redman conducted an internal medicine examination on Scott T. on January 12, 2023. Filing 6-1 at 357 (AR 678). Redman reported that:

> [Scott T.] appears to be in no acute distress. Loss of balance with toe walking. Able to right himself. Loss of balance with heels and rocked back requiring contact guard assist for heel walking. Squat full. Tandem walk normal. Stance normal. Needs no help changing for exam, by history. Needs no help getting on and off exam table. Able to rise from chair without difficulty.

Filing 6-1 at 359 (AR 680). During Redman's examination, Scott T. reported that all of his listed conditions—including back pain—started in 2005 due to several events. Filing 6-1 at 357 (AR

678). Redman noted that pain causes Scott T. difficulty in walking distances and further reported sharp pain "if he moves wrong and dull and throbbing [pain] while sitting." Filing 6-1 at 357 (AR 678). In Redman's notes, Scott T. "report[ed] overhead lifting recently (painting his son's room)" but such activities caused his right arm to feel heavy. Filing 6-1 at 358 (679). Finally, Redman records that Scott T. has a "[m]arked limitation to heavy lifting and carrying. Moderate limitation to reaching and overhead tasks or lifting. Moderate limitations to walking, prolonged standing, sitting, bending, or stooping." Filing 6-1 at 360 (AR 681).

e.    Scott T.'s Personal Testimony at the ALJ Hearing

On April 16, 2024, the ALJ held a hearing to review the commissioner's denial of Scott T.'s application for disability insurance benefits. Filing 5-2 at 38 (AR 37). Scott T. appeared at the hearing via telephone and was represented by his attorney. Filing 5-2 at 38 (AR 37). Scott T. testified that he previously worked at A-1 Fiberglass doing manufacturing related to fiberglass equipment for Kawasaki, All-Tech, and other similar companies. Filing 5-2 at 50 (AR 49). Scott T. also has prior work experience as a forklift operator. Filing 5-2 at 50 (AR 49). Scott T. testified that he also worked at Thompson Company in a short-term role "[w]here [he] picked . . . products . . . out of a warehouse and put them on a loading dock to be loaded into a semi." Filing 5-2 at 51 (AR 50). Scott T. then testified that he worked at Aurora Cooperative between 2009 and 2018 as a grain elevator operator. Filing 5-2 at 51–52 (AR 50–51). At the time of the hearing, Scott T. stated that he had not worked since May 14, 2018. Filing 5-2 at 53 (AR 52).

When asked about the significance of the date he filed for disability, Scott T. testified that "[i]t was a normal day . . . I don't know that that was the date I actually no longer worked. The accident happened a couple of days before that date. That was just when I went to the doctor and

all that stuff." Filing 5-2 at 53 (AR 52). The accident that Scott T. refers appears to be the fall down the stairs. Filing 5-2 at 23 (AR 22).[3]

The ALJ then inquired into Scott T.'s medical treatment plans, asking whether Scott T. had sought a medical opinion on the date of disability filing. Filing 5-2 at 53 (AR 52). Scott T. reported that he visited Central City Clinic before being referred to Nebraska Spine + Pain Center for a later surgery. Filing 5-2 at 53 (AR 52). Scott T. testified that prior to surgery, he tried several other conservative measures first, including "a lot of different physical therapies," along with purchasing an inversion table for his back, without receiving any relief. Filing 5-2 at 53–54 (AR 52–53).

Next, the ALJ inquired more specifically into Scott T.'s restrictions and symptoms. Filing 5-2 at 54–55 (AR 53–54). Scott T. stated that Dr. McClellan instructed him to change positions every thirty minutes, and limit lifting to no more than twenty-five pounds. Filing 5-2 at 54–55 (AR 53–54). The ALJ then asked Scott T. how long he could stand or walk. Filing 5-2 at 55 (AR 54). Scott T. testified,

> [I]f I push it, I can do about maybe an hour and a half, two hours . . . I told her we try to take our dogs on a walk every day. I can usually do . . . about less than a half a mile before I start having a lot of problems and have to sit down.

Filing 5-2 at 55 (AR 54). The ALJ then asked why Scott T. feels he could not do some other kind of light exertion work. Scott T. testified,

> I basically look like a question mark when I try to walk. I'm hunched over. I can't look straight ahead. I have to look at the ground. My legs and feet go numb. My hands go numb. I can't . . . grip things. And it periodically comes and goes. It's not like it's an every -- it's happening to me right now, but it will happen to me ten minutes from now.

Filing 5-2 at 55 (AR 54).

---

[3] The record contains conflicting reports regarding the onset of Scott T.'s back impairment. During an initial consultation with PA Stamm, Scott T. attributed his back pain to a May 6, 2018, accident where he "slipped and missed a step" while walking down the stairs. Filing 6-1 at 34 (AR 355). However, at other points in the Administrative Record, Scott T. alleges that his back pain originated as early as 2005. Filing 6-1 at 357 (AR 678).

When asked by the ALJ about exercise and hobbies, Scott T. testified that he does nothing more than "stretching exercises now." Filing 5-2 at 56 (AR 55). Additionally, Scott T. described a recent trip to Lake Tahoe, where he stated "I dove underneath the water about ten feet and my ear drums blew out." Filing 5-2 at 57 (AR 56). Scott T. explained that the return drive from Lake Tahoe took "almost five days . . . because of having to stop and get out of the vehicle, walk." Filing 5-2 at 57 (AR 56). Finally, Scott T. explained that additional hobbies include walking his dogs and using nuts and bolts to create "[l]ittle figurines." Filing 5-2 at 58 (AR 57). When the ALJ asked how long he could work on these activities at a time, Scott T. said "maybe 20–30 minutes before I have to sit down." Filing 5-2 at 58 (AR 57).

### 3. The ALJ's Impairment Findings

Under 20 C.F.R. § 416.920(b), an ALJ will conduct a five-step analysis to determine whether a claimant is disabled. *See Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (citing *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012)). The ALJ will consider the following during that analysis:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Grindley*, 9 F.4th at 628 (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (internal citation omitted)). The claimant generally bears the burden of proving he or she is disabled at the first four steps of the process, while the ALJ bears the burden of proving a claimant is not disabled at step five. 20 C.F.R. §§ 416.912(a)-(b), 416.960(c)(2). If the ALJ finds the claimant is not disabled at steps one, two, four, or five, or finds the claimant is disabled at steps three or five, the ALJ will end the analysis. 20 C.F.R. § 404.1520(a).

At the first step of the five-step sequential process, an ALJ will find a claimant is not disabled if the claimant is working and that work is considered substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial gainful activity is work activity that is both substantial and gainful." 20 C.F.R. § 404.1572. Substantial work activity is defined as "work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). Gainful work activity is defined as "work activity that you do for pay or profit." 20 C.F.R. § 404.1572(b). In this case, the ALJ determined Scott T. had not engaged in substantial gainful activity, allowing the ALJ to proceed to the second step of the analysis. Filing 5-2 at 20 (AR 19). The ALJ recognized that Scott T. had an income of $26,008.45 in 2018 and received long-term disability payments since the end of that year. Filing 5-2 at 20 (AR 19).The ALJ stated, "It appears that [Scott T.] does not have earned income after his alleged onset date; however, a full evaluation is not necessary, as there exists a separate valid reason to deny the claim, as discussed in more detail below." Filing 5-2 at 20 (AR 19). Thus, the ALJ was "satisfied that the claimant ha[d] not engaged in substantial gainful activity since his alleged onset date." Filing 5-2 at 20 (AR 19).

At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). A claimant's impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c). If an ALJ finds the claimant's medically determinable impairment or combination of impairments as not severe, the claimant is not disabled. 20 C.F.R. § 416.920(c). In this case, the ALJ determined Scott T.'s degenerative disc disease of the lumbar, thoracic, and cervical spine, carpal tunnel syndrome, deep venous thrombosis, and obesity are severe because they significantly limit his ability to perform basic work activities, which permitted the ALJ to continue to step three. Filing

5-2 at 20–21 (AR 19–20). Unlike the above medically determinable impairments, the ALJ found Scott T.'s renal stones, inguinal hernia, and bilateral otitis externa were not severe because the record did not establish that they caused more than minimal limitations in his ability to perform work-related activity. Filing 5-2 at 21 (AR 20). According to the ALJ, "[t]he record does not establish the presence of limitations associated with renal stones or otitis externa lasting at least twelve consecutive months." Filing 5-2 at 21 (AR 20). The ALJ also found that "the record does not establish that [Scott T.'s inguinal hernia] caused more than minimal limitation in [Scott T.'s] ability to perform work-related activity." Filing 5-2 at 21 (AR 20).

At the third step of the process, the ALJ will ascertain whether the claimant's impairment or combination of impairments is of a severity to meet the listed criteria in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant's impairment does meet the listed criteria the ALJ will find the claimant is disabled; if, however, the ALJ determines the claimant's impairment does not meet the listed criteria then the ALJ proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ found that none of Scott T.'s medically determinable impairments meet the criteria of "the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1," which prompted the ALJ to proceed to step four of the analysis. Filing 5-2 at 21–22 (AR 20–21).

### 4. *The ALJ's RFC Findings*

At step four of the five-step analysis, the ALJ will first determine the claimant's residual functional capacity (RFC), then assess the claimant's RFC in consideration of the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is her ability to do physical and mental work despite limitations from her impairments. 20 C.F.R. § 404.1545(a). "A disability claimant has the burden to establish her RFC." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004) (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)); *see also* 20 C.F.R.

§ 404.1512(a). The ALJ determines a claimant's RFC by using all relevant evidence in the claimant's case record, "including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger*, 390 F.3d at 591; *see also* 20 C.F.R. § 404.1545(a). The ALJ concluded the following pertaining to Scott T.'s RFC determination:

> After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a reduced range of light work as defined in 20 CFR 404.1567(b) except: he can stand and walk two hours total in an 8-hour workday; he can occasionally climb, balance, stoop, kneel, crouch, and crawl; he cannot climb ladders, ropes, or scaffolds; he can frequently reach in all directions, including overhead; he can frequently handle and finger; and he should avoid concentrated exposure to heat, cold, wetness, humidity, vibration, and hazards.

Filing 5-2 at 22 (AR 21).

Following the ALJ's determination of the claimant's RFC, the claimant's RFC will be compared to their past relevant work. 20 C.F.R. § 404.1520(f); *see also* 20 C.F.R. § 404.1560(b). Past relevant work is substantial gainful activity claimant performed within the past fifteen years or fifteen years prior to the date disability must be established, and that substantial gainful activity lasted long enough for the claimant to learn to do the work. 20 C.F.R. § 416.960(b)(1); *see generally* 20 C.F.R § 416.965(a). If the claimant has the RFC to do her past relevant work the ALJ will conclude the claimant is not disabled and the analysis ends, but if the claimant is unable to do any past relevant work or does not have any past relevant work the ALJ proceeds to the fifth and final step. 20 C.F.R. § 404.1520(f).

Here, the ALJ determined that "[t]hrough the date last insured, [Scott T.] was unable to perform any past relevant work. (20 CFR 404.1565)." Filing 5-2 at 27 (AR 26). The ALJ based this determination on testimony by the vocational expert (VE). Filing 5-2 at 27 (AR 26). VE Julie A. Harvey testified that Scott T. had past work as a grain elevator operator. Filing 5-2 at 27 (AR

18

26). The VE further testified that the "requirements of his job exceed the above residual functional capacity," and that "[Scott T.] was unable to perform past relevant work as actually or generally performed." Filing 5-2 at 27 (AR 26) (citing Filing 5-2 at 68–74 (AR 67–73)). Accordingly, the ALJ found that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Scott T.] is 'not disabled,' whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P. Appendix 2)." Filing 5-2 at 27 (AR 26).

5. *The ALJ's Findings Regarding Ability to Do Other Work*

At the fifth and last step of the disability analysis, the ALJ considers the claimant's RFC, age, education, and work experience to determine if claimant is capable of adjusting to other work. 20 C.F.R. § 404.1520(a)(4)(v). Once a claimant proves her inability to do past relevant work, the burden of proof switches from the claimant to the Commissioner to establish claimant possesses an RFC to do other work and that the other work exists in substantial numbers in the national economy, though this burden is limited, and the claimant still bears the ultimate burden of persuasion to establish she is disabled. *Goff*, 421 F.3d at 790 (citation omitted); *see also* 20 C.F.R § 404.1560(c). If the claimant can make an adjustment to other work that exists in the national economy, the ALJ will find the claimant to be not disabled. 20 C.F.R. § 404.1520(g). Conversely, if the claimant cannot adjust to other work or that other work does not exist in the national economy, the ALJ will find the claimant is disabled. 20 C.F.R. § 404.1520(g); *see generally* 20 C.F.R. § 404.1566. In determining a claimant's ability to adjust to other work and if other work exists in the national economy, an ALJ may call on a vocational expert to testify at the administrative hearing. 20 C.F.R. § 404.1566(e). The VE's role is "to take into account medical limitations, including opinions as to work time limits, and offer an opinion on the ultimate question

19

whether a claimant is capable of gainful employment." *Swedberg v. Saul*, 991 F.3d 902, 905 (8th Cir. 2021) (quoting *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995)).

In the present case, VE Julie A. Harvey testified at the administrative hearing as to Scott T.'s ability to adjust to other work and if other work existed in substantial numbers in the national economy. Filing 5-2 at 27–28 (AR 26–27). The ALJ asked Ms. Harvey if any jobs were available for a hypothetical person of Scott T.'s age, education, work experience at the sedentary exertional level provided the hypothetical individual could "lift 20 pounds occasionally, 10 pounds frequently;" "[s]tand or walk at least two hours of an eight-hour day and can sit with normal breaks without restrictions up to eight hours a day;" "occasionally climb, balance, stoop, kneel crouch, crawl;" but should avoid "work on ladders, ropes, scaffolds;" "[r]eaching can be frequent in both front, overhead;" "handling, fingering can be frequent;" but "should avoid concentrated exposure to heat or cold, wetness, humidity, vibration and hazards." Filing 5-2 at 67–74 (AR 66–73). In response to the ALJ's hypothetical question, Ms. Harvey cited four occupations that she believed Scott T. would be able to adjust to: "document preparer" (249.687-018); "telephone information clerk" (237.367-046); "food and beverage order clerk" (209.567-014); and "addresser" (209.587-010). The total number of available jobs across the four cited examples came to 23,100.[4] Ms. Harvey explained that each of the four listed occupational titles are sedentary, unskilled jobs with a specific vocational preparation (SVP) level of 2, matching Scott T.'s imposed physical limitations. Filing 5-2 at 69 (AR 68). In addition to citing the four example occupations, Ms. Harvey noted that the DOT does not address the issue of overhead reaching in its occupational listings, and thus based the provided example occupations in part on other vocational resources,

---

[4] The Social Security Administration relies on the Dictionary of Occupational Titles (DOT) for gathering information about occupations in the national economy. Every occupational title in the DOT has a corresponding nine-digit identification number. How to find an Occupational Title and Code, Information Technology Associates (Apr. 11, 2020), https://occupationalinfo.org/front_580.html.

experience, education, and training. Filing 5-2 at 70 (AR 69). However, Ms. Harvey acknowledged that, aside from the issue of overhead reaching, "everything else is consistent with the DOT." Filing 5-2 at 70 (AR 69).

In light of the VE's testimony and Scott T.'s age, education, work experience, and RFC, the ALJ concluded Scott T. "was capable of making a successful adjustment to [unskilled sedentary] work that existed in significant numbers in the national economy." Filing 5-2 at 28 (AR 27). As a result, the ALJ found that Scott T. was not disabled at step five of the disability determination. Filing 5-2 at 28 (AR 27); *see generally* 20 C.F.R. § 404.1520(g)(1).

## II. LEGAL ANALYSIS

### A. Standard of Review

A Social Security claimant must proceed through four levels of administrative review before the claimant may obtain judicial review in federal district court, including an Appeals Council review of the ALJ's decision. *Smith v. Berryhill*, 139 S. Ct. 1765, 1772 (2019); *see also* 42 U.S.C. § 405(g). Once at the federal district court level, the court will "decide whether the [ALJ]'s findings 'are supported by substantial evidence on the record as a whole.'" *Bowers v. Kijakazi*, 40 F.4th 872, 874 (8th Cir. 2022) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). "Substantial evidence [on the record as a whole] is less than a preponderance of the evidence" and is "'such relevant evidence as a reasonable mind would find adequate to support the Commissioner's conclusion.'" *Igo v. Colvin*, 839 F.3d 724, 728 (8th Cir. 2016) (quoting *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014) (internal citations and quotations omitted)). "Substantial evidence in the record as a whole" is a more rigorous standard than simply "substantial evidence" since the former standard requires consideration of evidence that supports or detracts from the ALJ's determination, whereas the latter does not. *Schmitt v. Kijakazi*, 27 F.4th 1353, 1358 (8th Cir. 2022) (quoting *Koch v. Kijakazi*, 4 F.4th 656, 663 (8th Cir. 2021) (cleaned

21

up and internal quotations omitted) ("Substantial evidence in the record as a whole" is a more "rigorous" standard than simply "substantial evidence," which is "evidence that a reasonable mind might accept as adequate to support the Commissioner's conclusion.")). The district court "will not reverse the [ALJ]'s decision merely because [the court] find[s] that 'substantial evidence exists in the record that would have supported a contrary outcome.'" *Austin v. Kijakazi*, 52 F.4th 723, 728 (8th Cir. 2022) (citing *Schmitt*, 27 F.4th at 1358) (internal quotations omitted)). Rather, "'[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'" *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

Additionally, the district court must determine whether the ALJ's decision "complies with the relevant legal standards." *Lucus v. Saul*, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (internal citations omitted)). "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." *Id.* (quoting *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (where the ALJ committed legal error by not posing a hypothetical question to the vocational expert) (omission in original)). "In conducting our limited and deferential review of the final agency determination under the substantial-evidence standard, we must view the record in the light most favorable to that determination." *Dols*, 931 F.3d at 748 (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)).

**B.  Discussion**

Scott T. asserts two grounds for reversing and remanding the ALJ's decision, as stated in the factual background. First, Scott T. argues the ALJ erred by improperly "explain[ing] the persuasive value [she] assigned to the opinions authored" when determining that three medical

22

opinions were not persuasive. Filing 13 at 12–17. Second, Scott T. contends the ALJ erred by improperly evaluating Plaintiff's subjective symptom testimony. Filing 13 at 17–20.

### 1.  The ALJ's Evaluation of Medical Opinions

Scott T. first argues that the ALJ failed to properly explain the persuasive value he assigned to the opinions authored by Dr. McClellan, NP Redman, and PA Stamm using the 'supportability' and 'consistency' factors. Filing 13 at 12–17. That is to say, Scott T. asserts the ALJ's decision is not supported by substantial evidence on the record as a whole. Filing 13 at 12–17. More specifically, Scott T. argues that the ALJ failed to weigh the requisite factors to arrive at the conclusion that the medical opinions were not persuasive, particularly because the ALJ did not consider the medical opinions in light of their supportability and consistency, *inter alia*, in determining Scott T.'s disabilities. Filing 13 at 12–17. Scott T. argues that the ALJ improperly evaluated the medical evidence of Dr. McClellan by not adequately explaining what evidence he found that was inconsistent with the medical opinion. Filing 13 at 13. Scott T. then claims the ALJ erred by finding that NP Redman's medical opinion was inconsistent with the record because the ALJ did not address NP Redman's finding that "[Scott T.] could not engage in prolonged periods of walking, standing, or sitting." Filing 13 at 13. Finally, Scott T. maintains that the ALJ failed to explain why the medical opinion of Sarah Stamm was not adopted. Filing 13 at 13. According to Scott T., the ALJ ignored the fact that "PA Stamm opined [Scott T.] was precluded from bending or twisting and was limited to carrying 15 to 20 pounds." Filing 13 at 16. According to Scott T., "[t]he ALJ did not include such limitations in the RFC or otherwise explain why." Filing 13 at 16. As a result, Scott T. argues that the "failure to acknowledge NP Stamm's opinions whatsoever resulted in harmful error." Filing 13 at 17.

The ALJ is required to "articulate in [her] determination of decision how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings." 20 C.F.R.

§ 404.1520c(b). The factors for consideration include supportability, consistency, relationship with the claimant, specialization and others. 20 C.F.R. § 404.1520c(c). "The factors of supportability . . . and consistency . . . are the most important factors" to be considered when evaluating the persuasiveness of a medical opinion. 20 C.F.R. § 404.1520c(b) (2). Accordingly, an ALJ is required to explain how he or she "considered the supportability and consistency" of a medical opinion in his or her decision. *Id.* However, the ALJ need not use the words "supportability" and "consistency" in making his or her determination so long as it is clear the factors were addressed. *See, e.g.*, *Atwood v. Kijakazi*, No. 4:20-CV-1394, 2022 WL 407119, at *5 (E.D. Mo. Feb. 10, 2022) ("The fact that the ALJ did not use the words 'supportability' and 'consistency' is not determinative; word choice alone does not warrant reversal." (citing *Kamann v. Colvin*, 721 F.3d 945, 951 (8th Cir. 2013)).

a.    The ALJ Correctly Evaluated Dr. John McClellan's Medical Opinions

Scott T. first avers the ALJ failed to "properly explain the persuasive value he assigned to the opinions authored by Dr. McClellan . . . using the 'supportability' and 'consistency' factors." Filing 13 at 12. In reference to July 2019, January 2020, and March 2020 opinions, the ALJ determined that those opinions were generally supported by references to accompanying medical evidence. Filing 5-2 at 26 (AR 25) ("These opinions are generally supported by the associated treatment notes."). However, certain inconsistencies between the opinions and other medical evidence included in the Administrative Record prompted the ALJ to find these opinions only to be "somewhat persuasive." Filing 5-2 at 26 (AR 25). The ALJ departed from Dr. McClellan's opinions relating to a preclusion on "repetitive bending, twisting, and stooping, and needs to change position as needed," along with "additional preclusion[s] in overhead work and lifting" because the limitations were inconsistent with the record as a whole. Filing 5-2 at 26 (AR 25). For instance, the ALJ stated "[t]hese limitations only consider the claimant's back, rather than the

combination of his impairments, and the longitudinal evidence does not establish the need to change position if the claimant has exertional limitations as outlined above." Filing 5-2 at 26 (AR 25).

Furthermore, Dr. McClellan's early restrictions appear to have been assigned during Scott T.'s post-operative recovery and likewise tailored to the healing of his back surgery. The ALJ properly observed that these opinions "only consider [Scott T.'s] back," rather than his overall functional status. Filing 5-2 at 26 (AR 25). Additionally, the ALJ's characterization of the "longitudinal evidence" as inconsistent with Dr. McClellan's early restrictions is supported by later medical evidence. Filing 5-2 at 26 (AR 25). While Dr. McClellan opined in early 2020 that Scott T. had extreme limitations, his subsequent treatment notes reflect an upward trajectory in Scott T.'s capabilities. Specifically, on October 14, 2020, Dr. McClellan noted that Scott T. "has seen essentially a doubling in his ability to stand," and that his back had become "much more predictable." Filing 6-1 at 119 (AR 440). In this same visit, Dr. McClellan noted that Scott T. reported being able to stand for 2 hours and sit for 2 hours. Filing 6-1 at 119 (AR 440). However, more recent medical opinions from Dr. McClellan fail to establish whether such a sitting limitation exists. Temporary physical restrictions arising out of a surgery are generally insufficient to qualify as statutory disability. *Barnes v. Northwest Iowa Health Ctr*., 238 F. Supp. 2d 1053, 1072 (N.D. IA 2002). Two months after an October 2022, visit, Dr. McClellan stated blanket temporary total disability status in an insurance work status sheet, but he made no indication as to the duration that Scott T. could stand, walk, or sit. Filing 6-2 at 41–42 (AR 852–53). In comparison, both of Scott T.'s 2023 medical examiner opinions identify prolonged standing impairments, but opined that Scott T. is capable of sitting for 6 hours in an 8-hour workday. Filing 5-3 at 6, 14 (AR 78, 86) An ALJ may give less weight to an inconsistent treating physician's opinion. *Turpin v. Colvin*, 750

F.3d 989, 993 (8th Cir. 2015) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) ("An ALJ may discount or disregard a treating physician's opinion . . . where a treating physician renders inconsistent opinions that undermine the credibility of such determinations.")). In reading the record as a whole, the ALJ correctly evaluated Dr. McClellan's early opinion using supportability and consistency factors.

In reference to the July 2020 opinion by Dr. McClellan, the ALJ determined that the opinion was "supported by the associated office note." Filing 5-2 at 26 (AR 25). However, the ALJ properly discounted this opinion by noting that "it appears to be based on the claimant's own statements regarding his abilities," rather than objective medical evidence. Filing 5-2 at 26 (AR 25). An ALJ may find that a medical opinion is less persuasive when it is a mere recitation of a claimant's subjective complaints. *See Bowers*, 40 F.4th at 875 (Where the ALJ found a medical opinion was less persuasive because substantial evidence, including the plaintiff's routine daily activities, contradicted the opinion.); *see also Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007) ("The ALJ was entitled to give less weight to [the medical] opinion, because it was based largely on [the claimant's] subjective complaints rather than on objective medical evidence."). Additionally, the ALJ contrasted Dr. McClellan's extreme sitting limitation with Scott T.'s admitted activities, such as driving, watching television, and personal care. Filing 5-2 at 26 (AR 25) ("This opinion is not consistent with other evidence of record, which does establish the need for limited standing and walking, but not for sitting."). The ALJ is permitted to consider the record as a whole, including such inconsistencies, when making determinations about the persuasiveness of medical opinions and the claimant's residual functional capacity. *See Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) ("[A]n ALJ may take the claimant's medical records into account when determining his or her credibility, and may discount a claimant's subjective complaints if

there are inconsistencies with the record as a whole."). In light of the contrast between Dr. McClellan's July 2020 restrictions and Scott T.'s documented daily activities, the ALJ's decision to discount the persuasiveness of the opinion is not a product of error but a valid exercise of discretion. Although Scott T. may disagree with the ALJ's conclusion, it is supported by substantial evidence on the record as a whole.

####    b.    The ALJ Correctly Evaluated Kristianna Redman's Medical Opinion

Second, Scott T. argues that the ALJ failed to properly explain why the ALJ did or did not find NP Redman's opinion persuasive using the mandatory "supportability" and "consistency" factors. Filing 13 at 12. The ALJ sufficiently weighed the supportability and consistency factors here. Although the ALJ does not explicitly use the word "supportability," her finding that the opinion is persuasive is predicated on a supportability and consistency analysis. Filing 5-2 at 26 (AR 25). The ALJ determined that the opinion was only "somewhat supported" by the associated narrative and opinion notes. Filing 5-2 at 26 (AR 25) ("[NP Redman's] opinion is only somewhat supported by the associated narrative, which does demonstrate some abnormalities, but not to the extent that would limit the claimant's ability to sit.").

Further, the ALJ's finding that NP Redman's medical opinion was persuasive was predicated on the application of the consistency factor. As stated above, the ALJ determined that the opinion was somewhat supported by "the associated narrative." Filing 5-2 at 26 (AR 25). However, certain abnormalities relating the Scott T.'s ability to sit prompted the ALJ to find this aspect of the opinion to be "only somewhat persuasive." Filing 5-2 at 26 (AR 25). That is, the ALJ departed from Redman's opinions relating to sitting limitations because "[t]he opinion does not quantify what a marked or moderate limitation is, which limits the ability to evaluate its consistency with other evidence." Filing 5-2 at 26 (AR 25). Thus, the ALJ evaluated the opinion's consistency and found it persuasive only "[t]o the extent that these limitations are indicative of the

27

ability to perform light work with reduced standing and walking and postural, manipulative, and environmental limitations." Filing 5-2 at 26 (AR 25). The ALJ's "somewhat persuasive" assessment of NP Redman's medical opinion properly accounted for both supportability and consistency; while supportability favored a finding of persuasiveness, the consistency factor necessitated a more limited application. Filing 5-2 at 26 (AR 25). The ALJ therefore fulfilled her responsibility to explain the supportability and consistency factors, even if not explicitly fleshed out. See Lucas v. Saul, 960 F.3d 1066, 1069 (8th Cir. 2020) ("an ALJ's explanation need not be exhaustive" so long as the explanation is not a "boilerplate" or "blanket" statement).

c.   The ALJ Adequately Considered Sarah Stamm's Medical Opinions

Finally, Scott T. avers the ALJ failed to acknowledge the persuasive value of the medical opinions authored by PA Stamm. Filing 13 at 12. Scott T. maintains that PA Stamm's medical opinions regarding Scott T.'s bending and twisting preclusions, limitations on carrying fifteen to twenty pounds, and the need to remain off work are consistent with substantial evidence in the record. Filing 13 at 16–17 (citing Filing 6-1 at 76, 86 (AR 397, 407)). In support, Scott T. argues that PA Stamm's opinions conflict with the ALJ's RFC finding "particularly in [PA Stamm's] total preclusion of [Scott T.] doing any bending or twisting," further arguing that the ALJ "did not include such limitations in the RFC or otherwise explain why." Filing 13 at 16 (citing Filing 5-1 at 22 (AR 21)). As a result, Scott T. contends that "the ALJ appears to have totally ignored PA Stamm's opinions resulting in reversable legal error." Filing 13 at 16.

Scott T. appropriately argues that the ALJ has an obligation to develop an administrative record "fully and fairly." Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). However, in the development of the record, an ALJ is not required to discuss every piece of evidence submitted. Id. (citing Miller v. Shalala, 8 F.3d 611, 613 (8th Cir. 1993)). Further, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. Montgomery v. Charter,

69 F.3d 273, 275 (8th Cir. 1995). An ALJ is not required to "explicitly . . . reconcile every conflicting shred of medical evidence" or how he considered each medical opinion individually, as long as the ALJ evaluates the persuasiveness of the opinions and weighs all the evidence in the record. *Austin v. Kijakazi*, 52 F.4th 723, 729 (8th Cir. 2022) (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981); see also 20 C.F.R. § 404.1520c(b)(1) ("[The ALJ] is not required to articulate how [she] considered each medical opinion . . . from one medical source individually.").

Both parties concede that the ALJ did not mention or explicitly evaluate PA Stamm's medical opinions in the written decision. *See* Filing 13 at 16; Filing 14 at 9. Scott T. contends that the ALJ ignored PA Stamm's opinions resulting in reversable error, and states that an ALJ "must minimally articulate his reasons for crediting or rejecting evidence of disability." Filing 13 at 16 (citing *Ingram v. Chater*, 107 F.3d 598, 601 (8th Cir. 1997)). This understanding is generally consistent with Social Security Regulations, which direct ALJs to "articulate in our determination or decision how persuasive [the Commissioner] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case of record." 20 C.F.R. § 404.1520c(b). However, the Regulations set out articulation requirements:

> Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

20 C.F.R. § 404.1520c(b)(1) ("Source-level articulation"). The Regulations suggest that an ALJ is not required to explicitly mention each medical provider by name, so long as provider's opinion is weighed in conjunction with all evidence in the record.

Scott T. points to medical opinions drafted by PA Stamm on two separate dates, in which Scott T. alleges to have been restricted to lifting fifteen to twenty pounds and a total preclusion from bending or twisting. Filing 13 at 16 (citing Filing 6-1 at 75–76, 85 (AR 396–97, 407)). Particularly, Scott T. contends that PA Stamm's restrictions conflict with the RFC finding because PA Stamm's restrictions involve a total preclusion of bending and twisting movements. Filing 13 at 16.

The restrictions opined by PA Stamm on February 25, 2019, and April 17, 2019, are consistent with other medical opinions of Dr. McClellan and PT Freeman during the same time frame. However, a review of the longitudinal record demonstrates that these alleged total preclusions were temporary measures issued in the immediate wake of surgery and were not intended to be permanent functional ceilings. Various medical records from Nebraska Spine + Pain Center indicate that Scott T. was eventually cleared of the total bending and twisting restrictions and assigned a new wight-lifting restriction of forty pounds. Filing 6-1 at 92, 98, 103 (AR 413, 419, 424). Additionally, Dr. McClellan later noted that Scott T. should avoid "excessive/repetitive bending, lifting, twisting, push[ing]/pull[ing], [and] stooping" and "must be able to change positions frequently for comfort." Filing 6-2 at 64 (AR 875). Further, subsequent evaluations by PA Stamm recommend regular exercise suggesting that Scott T. was free from the total preclusions cited in previous medical opinions. Filing 6-1 at 289 (AR 610); 6-2 at 11, 18 (AR 822, 829). Because these earlier restrictions on movement were inconsistent with more recent medical evidence, the ALJ's failure to provide a granular discussion of these temporary post-surgical restrictions does not undermine the substantial evidence supporting the RFC determination.

Scott T. states in his brief that "[t]he Court would be required to determine in the first instance whether there was substantial evidence to support the ALJ's decision to reject that

limitation. It is not within the Court's purview to speculate why the ALJ may have rejected certain evidence." Filing 13 at 16 (citing *Jones v. Chater*, 65 F.3d 102, 104 (8th Cir. 1995)). Scott T. is correct that this Court should not speculate why the ALJ may have rejected certain evidence. However, no such speculation is required here because the ALJ does not appear to have ignored the substance of PA Stamm's opinions. Although the ALJ did not directly mention PA Stamm by name, the ALJ explicitly addressed and rejected the identical restrictions imposed by PT Freeman on the very same date. Filing 5-2 at 26 (AR 25) (citing Filing 6-1 at 77 (AR 398)). Further, the ALJ determined that "[PT Freeman's] opinion is not consistent with the record in its entirety and is not persuasive." Filing 5-2 at 26 (AR 25) ("This opinion is supported by the associated physical therapy records. However, it was given in the context of [Scott T.'s] surgical recovery. Subsequent records demonstrate generally good recovery from his lumbar fusion and improvement in his functional abilities over time."). Therefore, the ALJ did not err by failing to specifically name PA Stamm, as the ALJ expressly considered and rejected the identical restrictions memorialized by PT Freeman during the same post-operative period as unpersuasive and inconsistent with the record as a whole.

### 2. The ALJ's Assessment of Scott T.'s Subjective Testimony

Scott T. next asserts that the ALJ erred by not properly evaluating Scott T.'s subjective testimony because the ALJ improperly weighed and evaluated evidence to discredit Scott T.'s complaints. Filing 13 at 17–20. In particular, Scott T. contends that the ALJ's "statements 'about the intensity, persistence, and limiting effects on his symptoms were not entirely consistent with the medical evidence and other evidence.'" Filing 13 at 18 (citing Filing 5-1 at 22 (AR 21)). Scott T. also asserted that his subjective complaints are supported by the fact that he "could only prepare quick meals or do light shopping." Filing 13 at 18 (citing Filing 5-2 at 62 (AR 61)). Further, Scott T. argues his complaints are supported by the fact that "he could do household chores with rest in

between them." Filing 13 at 19 (citing Filing 5-6 at 42 (AR 254)). The Commissioner responds by arguing that "[t]he ALJ correctly considered the evidence and reasonably determined that [Scott T.] retained the RFC to perform a reduced range of light work. Filing 14 at 11 (citing Filing 5-2 at 23 (AR 22)).

"All [of the applicant's] symptoms, including pain, and the extent to which [the applicant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" are considered when determining whether the applicant is disabled. 20 C.F.R. §§ 404.1529 and 416.929. Under sections 404.1529 and 416.929, the ALJ undertakes a two-step process for evaluating an applicant's symptoms. 20 C.F.R. §§ 404.1529 and 416.929. At step one, the ALJ determines whether the applicant has a medically determinable impairment that could "reasonably be expected to produce [his or her] symptoms." 20 C.F.R. §§ 1529(b) and 416.929(b). At step two, the ALJ evaluates the "intensity and persistence of [the applicant's] symptoms, such as pain, and determin[es] the extent to which [the applicant's] symptoms limit [his or her] capacity for work." 20 C.F.R. §§ 1529(c) and 416.929(c). In making this decision, objective medical evidence is considered. 20 C.F.R. §§ 1529(c)(2) and 416.929(c)(2). The ALJ must also consider what the applicant's "medical sources or nonmedical sources provide about [the applicant's] pain or other symptoms" when assessing the "intensity and persistence of [the applicant's] symptoms." 20 C.F.R. §§ 1529(c)(3) and 416.929(c)(3).

The Eighth Circuit Court of Appeals in *Polaski v. Heckler* established that the ALJ must additionally consider certain factors relevant to symptoms. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The *Polaski* factors created a standard for an ALJ's evaluation of a Social Security applicant's subjective complaints, requiring the ALJ to consider all evidence relating to the following factors: "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity

of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions." *Vance v. Berryhill,* 860 F.3d 1114, 1120 (8th Cir. 2017) (citing *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)); see *Polaski*, 739 F.2d at 1322. However, "[a]n ALJ need not expressly cite the *Polaski* factors when [. . .] the judge conducts an analysis pursuant to 20 C.F.R. § 416.929, because the regulation 'largely mirror[s] the *Polaski* factors.'" *Vance, 860 F.3d at 1120* (quoting *Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)*); *see* 20 C.F.R. § 416.929(c)(3)(i)–(iv), (vii).

Relating to step one of the subjective symptom analysis, the ALJ found that "[Scott T.'s] medically determinable impairments could reasonably be expected to cause some but not all of the alleged symptoms and severity." Filing 5-2 at 22 (AR 21). When conducting the second step of the analysis, the ALJ must identify "any inconsistencies in the evidence," as "[the applicant's] symptoms . . . will be determined to diminish [his or her] capacity for basic work activities . . . to the extent that [the applicant's] functional limitations and restrictions . . . can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 1529(c)(4) and 416.929(c)(4). Here, the ALJ determined that Scott T.'s subjective complaints about the limiting effects of his symptoms lacked credibility since they were "not entirely consistent with the medical evidence and other evidence in the record." Filing 5-2 at 22 (AR 21).

One reason articulated by the ALJ for this finding was that Scott T. described "daily activities that [were] not limited to the extent one would expect given the complaints of disabling symptoms and limitations." Filing 5-2 at 22 (AR 23). Scott T. alleged that his symptoms affected his ability to "lift, squat, bend, stand, reach, walk, sit, kneel, complete tasks, and use his hands." Filing 5-2 at 23 (AR 22) (citing Filing 5-6 at 46 (AR 258)). Further, Scott T. alleged that "he is unable to bend to clean and that he can only function for short periods before needing to sit or lie

down." Filing 5-2 at 23 (AR 22) (citing Filing 5-6 at 41–48 (AR 253–60)). However, Scott T. admitted the ability to "perform personal care tasks independently, such as bathing, dressing, personal hygiene, feeding, and toileting," along with the ability to "prepare simple meals, shop, and drive." Filing 5-2 at 23 (AR 22) (citing Filing 5-6 at 41–48 (AR 253–60)). Scott T. further admitted to possessing "the ability to do laundry, mow, clean, and do household repairs." Filing 5-2 at 23 (AR 22) (citing Filing 5-6 at 41–48 (AR 253–60)). The ALJ also pointed to Scott T.'s testimony where he explained that he can "lift a gallon of milk and change positions frequently." Filing 5-2 at 23 (AR 22) (citing Filing 5-2 at 63 (AR 62)).

The ALJ's finding was substantiated by the fact that two medical consultants opined that Scott T. "could perform light work with reduced standing and walking and postural, manipulative, and environmental limitations," and the ALJ found those opinions to be generally persuasive. Filing 5-2 at 25 (AR 24) (citing Filing 5-3 at 8, 16 (AR 80, 88)); 20 C.F.R. §§ 1529 and 416.929 ("We will consider your statements about the intensity, persistence, and limiting effects of your symptoms, and we will evaluate your statements in relation to the objective medical evidence and other evidence, in reaching a conclusion as to whether you are disabled.").

While Scott T. seems to challenge the depth of the ALJ's discussion regarding the weight afforded to subjective complaints and testimony, the credibility finding remains supported by the record as a whole. Under the deferential standard of review, there is no basis to disturb this determination. See *Nash v. Comm'r Soc. Sec. Admin.*, 907 F.3d 1086, 1090 (8th Cir. 2018) ("This court will not substitute its opinion for the ALJ's, who is in a better position to gauge credibility and resolve conflicts in evidence." (citation omitted)). The ALJ did not discount Scott T.'s subjective complaints. Filing 5-2 at 23 (AR 22). The ALJ affirmatively recognized the limitations imposed by his subjective symptoms, substantiated through objective medical findings, and

tailored the RFC to reflect such limitations. Filing 5-2 at 22–27 (AR 21–26). In sum, the ALJ's conclusion about Scott T.'s subjective complaints are supported by substantial evidence on the record as a whole.

### III. CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision that Scott T. is not disabled. Accordingly,

IT IS ORDERED that

1.    Scott T.'s motion for an Order Reversing the Commissioner's Decision, Filing 12, is denied;

2.    Commissioner's decision is affirmed;

3.    The Court will enter a separate judgment.


Dated this 9th day of April, 2026.

BY THE COURT:

Brian C. Buescher
United States District Judge

35